The first case this morning is Consolidated Appeal for purposes of Argument 15-1408 and 15-1409, Pentair Water Pool and Spa v. Hayward Industries. Mr. Boland whenever you're ready. Glad to see you brought some water with you. Thank you. I have, whenever I get started I run a little dry, no pun intended there, but once I get going. Good morning. May it please the court, I'm Mark Boland and represent the Appellant Pentair. Today we respectfully ask the court to reverse the judgment of the given the time I'm just going to focus on a few key points today. Claim 12 at issue relates to a pump for aquatic applications and the typical applications are described in column 3 of the patent. They're pools, they're spas, it can be a landscape pond, and so the pump is here, the reservoir is here, and the pump when it's turned on it will suck water into the cavity. There's a blade inside the pump that will then begin to pump the water to an output pipe. So just in the interest of time, so your position is it's limited, this word priming is limited to just the startup operation. Yes. And the board concluded that no it was not so limited. So what's the best you can do? Is it figure four in the specification? What is it you can point to to say that the board was incorrect in its broadest reasonable interpretation? Sure, your honor. In the claim construction, first the plain language in claim 12, it discusses achieving prime. It talks about determining whether the pump is primed and it calls for a maximum prime in time allotment. The ING clearly signifies achieving prime, going from a non-prime state to a prime state. Is that your problem there? You yourself just stated achieving prime any time in the operation. No, I meant in the startup phase, your honor. But you did say during the operation. Yes, your honor. What about your testimony by your expert, Dr. Woolley, who says in answer to her question, it refers to any time that the flow rate gets below a certain level. I believe that testimony may have been discussing Rasmussen, if I'm not correct, your honor. But in the 479 patent, if you look at the board's construction, it said three things. It said at startup, at restart, and when a loss of prime condition is determined. And I'm reading from page 19 of our brief. So three things. The 479 patent clearly discloses a startup routine with the primer. The 479 patent does not disclose a restart. There is no automatic restart. So any start is going to be back to the beginning, to press the start button. Third, when a loss of prime condition is determined, and consider that in connection with Hayward's arguments that that's in the context, too, of having a maximum priming time allotment. There's no disclosure in the specification of that particular type of embodiment. There's no determination of a loss of prime where a clock would start and say, okay, now you have a predetermined amount of time to regain the prime. Well, isn't there some stuff in the spec, even with respect to figure four, that refers to begins repetitive operation and is repeated, which suggests it's not exclusively at startup? Yes, Your Honor, that language does appear, and it's only in the context of the startup routine that's described in figure 4A. And in our briefs, if you'll recall, we have figure 4A with a red box for the startup routine, and there's some additional disclosure of that lower right-hand corner, the green box. The red box contains a diamond, 410. That's the only place where there's an actual comparison of the flow to a predetermined priming flow value. The only place. So the board's construction reads on subject matter that's not disclosed. And in any claim construction analysis, of course, one of the fundamental goals is to determine what was invented here. How can we align the claim with the intrinsic evidence, the specification and the prosecution history, of course? And when everything is said and done, the language by itself, read in light of the specification, where this is the only embodiment... What about read in light of Claim 13? Yes. Claim 13, Your Honor, uses slightly different language. The alarm that's triggered in Claim 13 is a priming dry alarm. The alarm that's triggered in Claim 12 is a priming alarm. Claim 13 doesn't have a maximum priming time allotment. The root word prime, or variance of it, appear in both claims. But the law is clear that... Doesn't Claim 13 teach that the system is checking whether the system is primed, and this continues even after the max priming time? I would respectfully disagree with that, Your Honor. And if, again, you turn to the image of Figure 4A in the startup routine represented in red, and this is page 9 of our reply brief, the Diamond 410 is the only place where there's an actual comparison of flow to a predetermined priming flow value. In the Claim 13 embodiment, which I've got marked in green here, which occurs during normal operation as part of the filter algorithm, what's being measured there is shaft power. The controller is determining the shaft power. If, during normal operation, it senses the shaft power is approaching zero for 10 seconds, a priming dry alarm can go off, and then the system is interrupted according to the specification. That is not a comparison with prime. There's never a determination in normal operation that prime has been lost. There's a determination at some point that the blade can be spinning in air and have negligible torque, and therefore it senses that's almost zero shaft power, and one of the things that the patent seeks to avoid is running in air. And therefore... Why else would it be running in air other than that it's lost prime? Well, it can lose prime because, say, there's a blockage in the intake system, and the system is designed to detect that, and when it's running at zero shaft power for 10 seconds, it will trigger this priming dry alarm, which is different than the routine at startup where the system runs. It does this repetitive comparison of flow rate versus priming flow rate very quickly, and if it reaches prime within the allotted time, it goes down to figure 4B and enters the normal operation. If it doesn't, the box all the way to the left says, trigger the priming alarm, we're dry, and the system will then... the alarm goes off, and according to the specification, the process is interrupted. Did you try to amend the claim at all at any time during the proceedings? I don't believe so, Your Honor. And turning to Rasmussen, the main reference, our position is that even if the broadest... even if the board's claim construction is upheld, and even if the combination of references is applied, Rasmussen is fundamentally different. Rasmussen discusses a downhole pump that's submerged into a well, and if you read the text and look at figure 1, you'll see the pump down underneath the fluid level, and it's got an opening in the bottom 20. So it draws water in automatically when it's submerged. These are called self-priming pumps. When Rasmussen starts up, the control logic that's Rasmussen's invention is turned off. So if the claim is limited to start up or restart, there's a clear distinction over Rasmussen. The control logic for determining whether the flow rate has dipped below the set point is inoperable. So when Rasmussen's critically analyzed, the only aspect of the board's claim construction that's relevant, or even potentially relevant, is the loss of prime determination. And in that particular aspect of the construction, Rasmussen never discloses a loss of prime determination. Is this during start up? Pardon? It does not detect the loss of prime? Is it only during start up? Is that what Rasmussen teaches? So Rasmussen, Your Honor, has the pump down below. It pumps the well fluid, which is crude oil, typically up top, and it's got a physical flow meter. It's determining the flow rate, gallons per minute, for example. And what Rasmussen does is say, I have a predetermined set point. When that flow drops below a predetermined value and stays there for a certain amount of time, shut down. So there's no damage to the pump below. But help me understand this. Are you saying that Rasmussen does not read on claim 12 because Rasmussen does not detect prime at start up? Under a limited construction, if this court finds that the construction is limited to start up, yes, that's true. Let's say we find the broader construction. Under the broader construction, Rasmussen is equally irrelevant because start up is one thing. Restart is the next aspect of the construction. Rasmussen states at the bottom of column 2, at restart, which is again a manual restart, there's no automatic restart, that control logic is shut down there as well. So we're into the third component, when a loss of prime is determined. Rasmussen is not determining loss of prime. It's only a loss of flow, which can be for... As long as it discloses a shut off due to a low flow rate, then who cares? Then why isn't that sufficient? Well, Your Honor, the low flow rate can be due to all of the items summarized in our brief. You can have contamination, rocks, sludge entering that pump from the well fluid. And those can physically block the blade. So the flow rate dips and because the pump is submerged, it's still fully primed. So when Rasmussen's alarm goes off at the control board, there's an LED light. One goes off when it drops below the set point and one goes off when the pump gets shut off. No one knows the reason. And the claim says determining a loss of prime. Rasmussen doesn't make that determination. It doesn't make a diagnosis at all. And that's our... Why don't you move on to the second issue? I'll move on to the second one. The second one, Your Honor... What we have in the 051 patent, Claim 1. Again, it's a smart pump and it's programmed to do various things. One of them is to operate in a limp mode. A limp mode is a state of operation at reduced or comprised levels. And under the board's construction, that means at reduced power or at reduced speed to achieve reduced power. If you turn to the Struthers reference, at page 2 of our reply brief, we summarized the various aspects of Struthers. So in the 051, when a problem's detected of the nature that's disclosed, like a lightning surge can cause voltage or current inside the motor to go out of whack or there can be an overheating situation, it's programmed to enter the limp mode. In Struthers, the pump states can be an empty tank. The tank level's too high. There can be overheating. In each of those situations, Struthers shuts down the pump or just triggers an alarm. So the only focus on Struthers that was presented below is really this clog removal process. Well, it addresses, Struthers addresses a relationship between torque and speed, right? It certainly does, Your Honor. And what it teaches is that when there's a physical clog, put that motor into an aggressive state to attack it with the blade. So it develops a low torque, a heavier force grinding through the clog, and to get that low torque, excuse me, the high torque and the extra force you want to grind through it, you have to reduce the speed to allow the torque to go up so that power is a function of torque times speed. So in the aggressive Struthers mode, there's only a disclosure of the high torque and low speed embodiment. Unless there's further questions, I'll save the remaining time for rebuttal. Thank you. May it please the Court. I'll begin with the 051 patent. The central issue in the 051 patent, as you honors know, is the meaning of the term limp mode and the teachings of the reference Struthers with respect to limp mode. The board's construction in the final written decision is a restatement of its construction from the institution decision. Under both of those constructions, and under any construction that's true to the BRI standard, we submit that the board was correct in finding that Struthers teaches the limp mode. Why did the board change its construction in this patent from the initial to the final determination to include the phrase to achieve a reduction in power? I think that's a very good question. And if one was to look literally at the final written decision, they said that they looked at what the ex parte examiner had said during the ex parte prosecution. And while it was true that the ex parte examiner did say reduce speed state, reduce power state, it was the board's perception that the ex parte examiner had seen some type of association between limp mode and power. Simultaneously in parallel with that, we believe that the board was trying to be responsive to a point that Penter made, which is a very inviting point, which is, well, under the original construction, if a user walks over to their variable speed pump and changes the speed from a high speed to a low speed, is that going to be a limp mode? And I think that responsive to that, and again, following their perception that the examiner associated limp mode with power, they restated their construction. Now, what's interesting is that the discussion of the ex parte examiner where he espouses his understanding of the meaning of limp mode was in his discussion of his belief that Struthers taught a limp mode. So it's not just that the board believes that Struthers teaches a limp mode. It's also that the ex parte examiner believes that limp mode is taught by Struthers. And in that same passage of the final written decision where the board discusses how their restatement of the construction was inspired by the ex parte examiner, they mention that's consistent with Penter's expert's testimony about the meaning of the word limp mode, what their expert understands limp mode to mean. And interestingly, in the co-pending litigation, twice, once at A5770 and once at A5856, their expert admitted Struthers teaches a limp mode. So the evolution of the term limp mode is helpful to understand. At the end of the day, the source text, of course, is the specification and with deference to the prosecution history, of course. And I think there are three key locations in the specification and the file history that we can look to that actually talk about the limp mode and what it means aside from just... Why don't you point to the specification where it teaches the added limitation in the final decision to achieve a reduction in power? I don't see that in the specification, Your Honor. I do see column two, lines one through seven, where the limp mode is described using and slash or, reducing voltage and or frequency. Now, everybody agrees that frequency here is a reference to speed. So reducing the voltage and or the frequency. Now, column 18, lines 19 through 24, we get the other reference where they're talking about limp mode and actually explaining what it means. And that's what they say. It's reducing at least one or both of voltage or the frequency. A third location that's extremely instructive is in the parent application, which went on appeal to the board. And by the way, the claim construction on that appeal to the board was the initial claim construction in this case, reduced power state, reduced speed state. But in that appeal to the board of the parent case, which is incorporated by reference into this case, the first independent claim, which appears in this record as claim 18 because of just the documents that are in the record here, Pantera claimed something to the effect of reducing at least one of the voltage and the frequency in order to drive the motor in a limp mode to clear a foreign object obstruction. So, you know, we can talk about the technological concepts or we can talk about the labels, the words that are on them. But what we see in that claim in the parent application, this is a divisional, it's the same spec, is a claim to reducing the speed to clear a clock. That's exactly what Struthers teaches. So, your honors, if I might, I would point to the board's claim construction. Of course, claim construction is de novo. But if we were going to stay with the board's ultimate claim construction, it's two disjunctive prongs. It's a reduced power state or a reduced speed state to achieve a reduction in power. If we're going to avoid eviscerating one of those prongs, we have to understand each prong to have a different meaning. A reduced speed state is not a reduced power state. A reduced speed state to achieve a reduction in power is exactly what's happening in Struthers. In the background of the invention, Struthers talks about reducing the speed for the purpose of avoiding an overload. An overload is too much power. This thing, if you don't keep the system in check, the power's going to go up. It's going to overheat. You're going to have a big problem. Our expert, Professor Amati, testified at A6209 to A6210. This is exactly what's happening in Struthers. Now, everyone seems in agreement here that power equals torque times speed. Power equals torque times speed. So you have two variables. If speed is constant and fixed, and you don't change the speed, when the torque goes up, the power's going to shoot up. It's going to shoot up. Left unchecked, this torque is going to cause the power to go way up. It's going to overload. It's going to overheat, exactly like what's in the background of the invention in Struthers. But when that torque starts going up by virtue of there being a clog, in order to prevent this power from shooting way up, the speed is throttled down, and the motor's allowed to limp along slowly. And here we have a situation where we have a reduced speed state that's achieving a reduced power relative to what the power would have been. It's right there in Struthers, Your Honors. Can I take you back to the 479 patent? Sure. Where you began, and where you began was appropriately with the broadest reasonable interpretation, because that's the current state of the law, notwithstanding concerns some of us has raised with that. In this particular circumstance, do you see a difference between the most reasonable interpretation and the broadest reasonable interpretation with regard to priming? With regard to priming? No, I apologize, Your Honor. Could you say that question again? I want to make sure I understand it. We're applying the standard which is the standard that the Board appropriately applied in construing the claim. Is there a difference in your view with respect to the Board's selection of the broadest reasonable interpretation and what would otherwise be the most reasonable interpretation under a straightforward claim construction that doesn't implicate broadest reasonable interpretation? We're talking about the 479 Claim 12? No, I think under any standard, Claim 12 means exactly what it says. And I believe... Well, you don't think there's some ambiguity? In 479? No, I think the verb tense is very clear. I think it says, is primed, and I think it says, is not primed. There was some reference... But if we look at Figure 4, your friend makes an argument that the only disclosure there with respect to Figure 4 is only in connection with the startup. Well, he also started to talk about... There was a suggestion that the word ING is in Claim 12, but it's not in Claim 13. I don't know if I misheard that, but I do see that word in Claim 13, actually. And Claim 13 is directed towards a loss of prime. So to say that there's no disclosure of loss of prime in the specification of the 479 when Claim 13 is admittedly directed towards a loss of prime scenario wouldn't be consistent if that was what Pinto was arguing. So, with respect to the 479 patent... Did I answer your question, Your Honor? Well, yeah, but why don't we talk about Claim 12, which is the claimant issue, and where the disclosure there is clear that it goes beyond the startup? Yes. Well, first of all, again, the issue I think is properly framed is whether or not Claim 12 is of sufficient breadth to cover an initial acquisition of prime after prime never existed, or a subsequent acquisition of prime after prime had existed and had been lost. And we've never taken the position that Claim 12 excludes a startup situation. Our position at Claim 12 is a generic claim that covers multiple species. And there's certainly no requirement for the specification to teach the species of the prior art for that prior art to render the generic claim unpatentable. I mean, to require a specification to teach the prior art would be a little circular. But even if we go in to the specification of the 479 and we get into detail, at 3 colon 26 through 27, they refer to figures 4A and 4B as one example process. Now, at 3 colon 38, there's typically, you know, conventionally, somebody might title this portion of their specification a detailed description of the invention. This is entitled the Description of Example Embodiments. And of course, we know that a claim can be directed towards certain aspects of the specification and not others. We don't see recited in Claim 12 the moment in time when a clock stops ticking. We know that there's a clock. We know it's going to tick. But there is no anchor. There is nothing explicitly or otherwise in Claim 12 that would require a clock in Claim 12 to have that clock start ticking. There's nothing in Claim 12 that would require a construction of this to go beyond the initial start of it? I think that it's generic language in and of itself. I mean, you're talking about the plain meaning of the words. Correct. Claim 12 does not say, does not contain the restriction that, or the limitation, rather, that it goes on beyond the initial startup. Absolutely, you're correct, Your Honor. So, what the specification does say... Well, isn't that a problem for you? No. Actually, the way I understood the question was that Claim 12 doesn't include any limitation on any individual species. That's what I understood the question to be asking. There's no limitation on Claim 12 that it be at startup. There's no limitation on Claim 12 that it be after startup. There's no limitation. It can be at any point in the process. But you're arguing that the plain meaning of the words in Claim 12 should take us to beyond the initial startup. Yes, they cover all time periods. It covers all time periods. If there's a situation... Why do you say that in Claim 12? All time periods? Because it doesn't carve out specific time periods for which it's applicable. So the plain meaning of the words would exclude anything beyond initial startup. Actually, no. The term prime and priming is often used to refer to a loss of prime. Number one, we see the term priming in Claim 13. And number two, from the prosecution history, there's a claim of priority to a parent application specifically alleged to apply to Claim 12 in the co-pending litigation and the proceeding below. So we know priority is alleged for Claim 12. Back to the priority document. The sole and exclusive reference to prime in the parent document at Paragraph 31 is loss of prime. That's it. The words loss of prime don't find their origin in any type of analogy to a painter and whether a painter uses the words loss of prime. They're right there in the file history of this patent. Your Honor, if I may, at Column 9, Lines 29 through 34, this is described as a priming control, this process. We sat in a room and looked at their expert, Gary Woolley, and asked him to read out loud the abstract of Rasmussen. And after he read that, we looked at it and said, and that's a priming control that's not happening at startup. He said, yes. His position has been that there's no concern in Rasmussen about priming control at startup. Our position is that Rasmussen teaches a loss of prime and that this claim is not limited in such a respect as it would exclude a loss of prime. Loss of prime, again, not just our words. These words come from the file history. These are concepts that are also covered by Claim 13 which uses the priming language. And if one looks at Rasmussen A1154, that's Column 9, Lines 8 through 18, it says, when the flow gets too low, display indicates an abnormally low flow indicating more than the usual quantity of gases through the system. The lights go off and after the timer... I'm out of time. Just finish your sentence. One set of lights goes off when the display indicates abnormally low flow indicating more than the usual quantity of gas. Timer starts ticking. When the timer is done, it elapses and a new pattern of lights emerges. And your timer is done. Thank you. Thank you. Your Honors, my colleague advised me that I only just took 15 minutes. Did we start with 20 or 15? I can't remember. We started with 15? I'm sorry, Your Honor. I noted that it started at 15. Okay. I apologize for that. It started at 15. If you noticed it, I think we... Thank you, Your Honors. Does the Court have any questions for me? If not, I'll sit down. Thank you. Thank you. In the board's claim interpretation in the 479 patent where you have start up, restart, or when a loss of prime is determined. At start up, Rasmussen shuts down the control logic. Whether you call it determining flow or priming, it's shut down. At restart, it's shut down. So all left with is a loss of prime determination. A determination requires a diagnosis. So when, on the control panel, somebody has sensed a loss of flow from the physical flow meter and it sets off one red light, that loss of flow persists for the predetermined time and then the pump gets shut down and a second red light goes off. No one knows why the light went off. That cannot be a determination of loss of prime. Rasmussen says that the low flow can be due to contamination, abrasives, solid deposits. But I think I asked you the first time around, so maybe you're not understanding the question or maybe I'm not understanding the answer. Which is, as long as it discloses a shut off due to low flow rate, why isn't that sufficient? Because that is not a determination of loss of prime. The low flow rate can be due to many different reasons, all described in columns 1 and 2. Is a zero flow rate, let's say it's a zero flow rate. No, Your Honor. In a zero flow rate where a rock has come in and blocked that blade so it can't spin, that pump in Rasmussen is fully primed. It's like if you're driving a car, your check engine light goes on. You might feel something wrong with the car or the motor and pull over. The driver doesn't know what's causing that check engine light. It's the same thing. Does it have power at that time? For the check engine light, Your Honor. I mean, you don't know why, but you stop the car. At that point, you no longer are at full prime. Right? In my example, the driver could equally have continued driving the car with the check engine light. My point is... So Rasmussen covers more than the claim. That doesn't mean it doesn't cover the claim. In fact, the claim says a loss of prime is determined. And our position is there's never such a determination made. And there's been no evidence put on that that determination was made in Rasmussen. So the claim language, controller determining whether the current flow rate is above a priming flow value in order to determine whether the pumping system is primed. The pumping system can be fully primed and the flow rate can go to zero because there's a blockage. Or there's damage to the pump blade because of wear and deposits and the like. And in all those situations, other than transient gas, which may cause a blip in the flow rate, where the pump is submerged as in Rasmussen, a loss of flow cannot be equated with a loss of prime. On Struthers and the other appeal now, a couple of last points. Struthers is taking the, the controller takes the pump and operates it in an aggressive manner. Would you agree an unprimed pump will not pump? An unprimed pump will have no fluid in it to pump, Your Honor. And in Rasmussen, because it's submerged, that pump is going to be primed. It doesn't state a percentage, but I believe somebody skilled in the art would tell you practically the entire time. What happens is there's transient gas pockets that can come in. And what Rasmussen does is try to keep things running then. So it allows a little grace period for the gas to come in. You can see a blip at the flow meter. And then once the gas passes through, continue operation. So it wants to keep running when there's gas. So that's what we contend on Rasmussen. Given the time, I don't think I will get into the Struthers and 051 any further. So let's see if the Court has questions. Thank you very much for your time. Thank you. We thank both parties and the cases that submitted.